**IN THE UNITED STATES DISTRICT COURT**

**FOR THE MIDDLE DISTRICT OF FLORIDA**

| | |
|---|---|
| JELENA ZURILO, derivatively on behalf of FIRST CHOICE HEALTHCARE SOLUTIONS, INC., | **C.A. No. _____** |
| Plaintiff, | |
| vs. | **DEMAND FOR JURY TRIAL** |
| CHRISTIAN C. ROMANDETTI, PHILLIP J. KELLER, GARY AUGUSTA, DONALD A. BITTAR, JAMES RENNA, SHEILA H. SCHWEITZER, MARK BURNETT, JEFFREY MILLER, FRANK SARRO, ANTHONY VASSALLO, and ELITE STOCK RESEARCH, INC., | |
| Defendants, | |
| and | |
| FIRST CHOICE HEALTHCARE SOLUTIONS, INC., | |
| Nominal Defendant. | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**INTRODUCTION**

Plaintiff Jelena Zurilo ("Plaintiff"), by her undersigned attorneys, derivatively and on behalf of Nominal Defendant First Choice Healthcare Solutions, Inc. ("First Choice" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Christian C. Romandetti, Phillip J. Keller, Gary Augusta, Donald A. Bittar, James Renna, and Sheila H. Schweitzer (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of First Choice, unjust enrichment, and violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Mark

Burnett, Jeffrey Miller, Frank Sarro, Anthony Vassallo, and Elite Stock Research, Inc. (collectively, with Defendant Christian C. Romandetti, the "Shareholder Defendants," and together with First Choice and the Individual Defendants, the "Defendants") for unjust enrichment and aiding and abetting the Individual Defendants' breaches of fiduciary duty. As for her complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding First Choice, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **<u>NATURE OF THE ACTION</u>**

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by First Choice's directors and officers starting in 2013 and continuing through the present (the "Relevant Period").

2.      First Choice is a healthcare services company operating out of central Florida. The Company manages several healthcare centers specializing in orthopedic medicine and related practices.

3.      Beginning in 2013, and continuing throughout the Relevant Period, Defendant Christian C. Romandetti ("Romandetti"), who was then serving as the Company's President, Chief Executive Officer ("CEO"), and Chairman, conspired with a small group of Company shareholders to manipulate the stock price and trading volume of First Choice shares, and to swindle funds from

hundreds of unsuspecting investors. These conspirators implemented this scheme by engaging Elite Stock Research, Inc. ("Elite Stock Research"), a "boiler room" business owned and run by Defendant Vassallo, to promote the Company, and to target and aggressively solicit unsophisticated investors to purchase First Choice Stock. At the same time, Defendants Vassallo, Burnett, Miller, and Sarro made numerous trades of Company stock in order to create the illusion of high trading volume and to artificially inflate the Company's stock price. Through this scheme, the Shareholder Defendants raked in over $3.3 million in trading profits and caused the investors they solicited to suffer approximately $2.5 million in losses. The misconduct alleged in this paragraph is referred to collectively herein as the "Pump and Dump Scheme."

4.       The other Individual Defendants, who controlled the Company by way of their positions as senior executive officers and/or directors of First Choice, either actively facilitated or were at least aware of the Pump and Dump Scheme. Despite this, the Individual Defendants specifically omitted any references to the Pump and Dump Scheme or its ramifications from the Company's SEC filings issued during the Relevant Period.

5.       The Pump & Dump Scheme was revealed on November 15, 2018, when the Department of Justice (the "DOJ") issued a press release announcing that it had issued an indictment of Defendants Romandetti, Burnett, Miller, and Sarro in connection with the Pump and Dump Scheme (the "DOJ Action"). The DOJ Action is captioned *United States v. Romandetti, et al.*, CR 18-614-JS-GRB (E.D.N.Y. Nov. 14, 2018). The complaint filed in the DOJ Action is incorporated by reference herein.

6.       That same day, the SEC also issued a press release revealing that it had filed a complaint against Defendants Romandetti, Burnett, Miller, Sarro, Vassallo, and Elite Stock Research (the "SEC Action").  The SEC Action is captioned *Securities and Exchange Commission*

*v. Burnett, et al.*, Case No. 2:18-CV-6501-JS-AKT (E.D.N.Y. Nov. 15, 2018).  The complaint filed in the SEC Action is incorporated by reference herein.

7.      On this news, the price of the Company's stock dropped from $1.01 per share at the close of trading on November 14, 2018, to $0.35 per share at the close of trading on November 15, 2018, representing a loss in value of almost 65%.

8.      Later that same day, on November 15, 2018, the Company placed Defendant Romandetti on "indefinite administrative leave." On December 4, 2018, Defendant Romandetti resigned from the Company's Board of Directors (the "Board"), and ultimately, on December 28, 2018, Defendant Romandetti was terminated from his positions with the Company.

9.      Subsequently, on March 29, 2019, and May 15, 2019, respectively, the Company notified the SEC that it would be unable to timely file its annual report on Form 10-K for the fiscal year ended December 31, 2018 (the "2018 10-K"), and its quarterly report on Form 10-Q for the fiscal quarter ended March 31, 2019 (the "1Q19 10-Q"). As of March 4, 2020, the Company has yet to file these, or any other subsequent periodic reports.

10.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by participating in or facilitating the Pump and Dump Scheme, by failing to maintain internal controls, and by causing the Company to fail to timely file its periodic reports with the SEC.

11.     The Shareholder Defendants aided and abetted the Individual Defendants' breaches of fiduciary duty and were unjustly enriched as a result of their misconduct.

12.     Also during the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make a series of materially false and misleading statements regarding the Company's business, operations, prospects, and legal

compliance. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose that: (1) Defendant Romandetti and a number of other individuals and entities were engaged in the Pump and Dump Scheme; (2) as a result of the Pump and Dump Scheme, First Choice and certain of its management would be subject to heightened scrutiny from government agencies, including the DOJ and the SEC, which would foreseeably culminate in significant damage to the Company, including legal liability and loss of reputation; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

13.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

14.     Furthermore, during the Relevant Period, when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein, the Individual Defendants caused the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Approximately 189,020 shares of the Company's common stock were repurchased during the Relevant Period for approximately $249,506. As the Company's stock was actually only worth $0.35 per share during that time, the price at closing on November 15, 2018, the Company overpaid by approximately $183,349 in total.

15.     In light of the Individual Defendants' misconduct, which has subjected First Choice and its former President and CEO to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Middle District of Florida (the "Securities Class Action"), subjected the former President and CEO to being named as a defendant

in the SEC Action and in the DOJ Action, the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, and the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

16.     In the Securities Class Action, Magistrate Judge Leslie R. Hoffman issued a Report and Recommendation on October 16, 2019 recommending that First Choice's and Defendant Romandetti's motions to dismiss the Securities Class Action be denied. On February 14, 2020, the Court entered an order adopting Magistrate Judge Hoffman's Report and Recommendation and denying First Choice's and Defendant Romandetti's motions to dismiss.

17.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

18.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, several of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action, the substantial likelihood of the former CEO and Company's liability in the Securities Action and the former CEO's liability in the DOJ Action and SEC Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

20.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

21.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

22.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

23.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

24.     Plaintiff is a current shareholder of First Choice. Plaintiff has continuously held First Choice common stock at all relevant times.

**Nominal Defendant First Choice**

25.     First Choice is a Delaware corporation with its principal executive offices at 709 S. Harbor Blvd., Suite 250, Melbourne, Florida 32901. First Choice's shares trade on the Over-the-Counter Markets ("OTC") under the ticker symbol "FCHS."

**Defendant Romandetti**

26.     Defendant Romandetti served as the Company's CEO, President, and Chairman from December 2010 until he was terminated on December 28, 2018. According to the Company's annual report on Form 10-K filed with the SEC on April 2, 2018 (the "2017 10-K"), as of March 23, 2018, Defendant Romandetti beneficially owned 6,931,578 shares of the Company's common stock, which represented 21.5% of outstanding shares on that date. Given that the price per share of the Company's common stock at the close of trading on March 23, 2018 was $1.42, Defendant Romandetti owned approximately $9.84 million worth of First Choice common stock.

27.     For the fiscal year ended December 31, 2017, Defendant Romandetti received $336,666 in compensation from the Company. This included $289,406 in salary, $35,000 in bonuses, and $12,607 in all other compensation.

28.     The 2017 10-K stated the following about Defendant Romandetti:

A serial entrepreneur and proven senior executive with experience in a broad range of industries, Mr. Romandetti has served as First Choice Healthcare Solution's Chairman, President and CEO since December 2010. In this role, he is responsible for articulating our Company's vision and executing strategies that place clinically superior, patient-centric care and improved clinical outcomes at the core of FCHS's corporate mission.

Since 2003 through to the present, Mr. Romandetti has been the Managing Member of Marina Towers, LLC, which is now a wholly owned subsidiary of First Choice Healthcare Solutions; and the Managing Member of C&K, LLC, a property holding company. Since 2007, he has also lent his business building expertise to medical practices and MRI centers as a professional business consultant to the healthcare industry. Previously, he was a founding director of Sunrise Bank, a community bank serving local businesses in Florida's Space Coast and served as an executive

8

officer for numerous companies in the real estate, marine, automotive and construction products industries.

29.    Upon information and belief, Defendant Romandetti is a resident of Florida.

**Defendant Keller**

30.    Defendant Phillip J. Keller ("Keller") has served as the Company's Chief Financial Officer ("CFO") since July 24, 2017, and he has served as the Company's interim CEO since November 19, 2018. According to the 2017 10-K, as of March 23, 2018, Defendant Keller beneficially owned 350,000 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 23, 2018 was $1.42, Defendant Keller owned approximately $497,000 worth of First Choice common stock.

31.    For the fiscal year ended December 31, 2017, Defendant Keller received $75,673 in compensation from the Company. This included $70,673 in salary and $5,000 in bonuses.

32.    The 2017 10-K stated the following about Defendant Keller:

Mr. Keller was appointed Chief Financial Officer on July 24, 2017. From 2014 through 2015, Mr. Keller, age 51, served as Senior Vice President of Finance and Chief Financial Officer of RehabCare Inc., a provider of physical, occupational and speech-language rehabilitation services to hospitals, skilled nursing facilities and home care settings in 47 states across the United States of America. Prior to joining RehabCare Inc. in 2014, Mr. Keller served as Senior Vice President of Finance of PharMerica, Inc. (NYSE: PMC), an institutional pharmacy servicing skilled nursing and assisted living facilities, hospitals and other long term alternative care facilities. Other previous executive posts have included Senior Vice President of Finance and Principal Accounting Officer of BioScrip, Inc. (NASDAQ: BIOS), and Vice President of Finance, Chief Financial Officer and Treasurer of DMI Furniture Inc. (NASDAQ: DMIF). In May 1991, Mr. Keller earned his Certified Public Accountant license. He began his career working as a Staff Accountant for Laventhol & Horwath after graduating from the Loyola University of Chicago with a B.S. degree in Accounting.

**Defendant Augusta**

33.     Defendant Gary Augusta ("Augusta") has served as a Company director since September 7, 2018. He also serves as the Chair of the Company's Nominating and Corporate Governance Committee, and as a member of the Audit Committee and Compensation Committee.

34.     The Company's website states the following about Defendant Augusta:[1]

Mr. Gary Augusta has over 25 years of experience in healthcare and other innovative sectors including leadership roles in mergers and acquisitions, capital markets and investments, strategic planning, corporate partnerships, and as a public company Board Director. Mr. Augusta is currently on the Board of Directors of Apollo Medical Holdings, Inc. and has had that position since March 2012. Previous roles at Apollo Medical include President, Executive Chairman and Consultant. Mr. Augusta also currently serves as President of Flacane Advisors focusing on healthcare and technology advisory and investments.

Mr. Augusta served as President of SpaGus Ventures and SpaGus Capital Partners focusing on healthcare and technology investments and advisory services. Additionally, Mr. Augusta was President and CEO of OCTANe, an innovation development company. As a Corporate Officer at Fluor, Inc., a Fortune 500 company, Mr. Augusta focused on Corporate Development and M&A. AT Kearney, a leading global consulting firm, benefited from Mr. Augusta's experience as a Consultant and Principal.

Mr. Augusta earned a BS in Mechanical Engineering from the University of Rhode Island and a Master of Science and Management (MSM) from Georgia Institute of Technology (Georgia Tech).

35.     Upon information and belief, Defendant Augusta is a resident of Florida.

**Defendant Bittar**

36.     Defendant Donald A. Bittar ("Bittar") served as a Company director from December 2010 until he resigned on March 6, 2018. Previously, he served as the Company's CFO from 2010 through July 2016. According to the 2017 10-K, as of March 23, 2018, Defendant Bittar beneficially owned 526,666 shares of the Company's common stock, which represented 1.6% of

---

[1] https://ir.myfchs.com/board-of-directors. Last visited February 18, 2020.

outstanding shares on that date. Given that the price per share of the Company's common stock at the close of trading on March 23, 2018 was $1.42, Defendant Bittar owned approximately $747,865 worth of First Choice common stock.

37.     For the fiscal year ended December 31, 2017, Defendant Bittar received $49,700 in compensation from the Company. This included $12,500 in salary and $37,200 in stock awards.

38.     The 2017 10-K stated the following about Defendant Bittar:

In December 2010, Mr. Bittar was appointed as our Company's CFO, Treasurer and Secretary and a member of the Board of Directors. In November 2014, he briefly retired from his role as First Choice's CFO but returned in March 2015 and again retired in July 2016 upon the appointment of Mr. Skeldon.

Mr. Bittar brings our Company more than 30 years' experience working with companies as an officer, board member and consultant. Before joining the First Choice leadership team, he served as President and Chairman of Associated Mortgage of North America and President of DA Bittar and Associates, Inc., a management and technology consulting firm that he founded in 1980. From 1969 to 1980, he was Chairman, President and CEO of Marine Telephone, Inc.

On March 6, 2018 Mr. Bittar resigned his position as Director. Mr. Bittar's decision to resign from the Company's board of directors is not the result of any disagreement with the Company's operations, policies or procedures.

39.     Upon information and belief, Defendant Bittar is a resident of Florida.

**Defendant Renna**

40.     Defendant James Renna ("Renna") has served as a Company director since September 7, 2018. He also serves as the Chair of the Company's Audit Committee, and as a member of the Nominating and Corporate Governance Committee and Compensation Committee.

41.     The Company's website states the following about Defendant Renna:[2]

Mr. Renna is a senior private equity executive with experience in financial and operations management, mergers and acquisitions, fund raising, portfolio management and investor relations across a variety of industries including healthcare services, biotech, pharmaceutical, manufacturing, energy and media.

---

[2] https://ir.myfchs.com/board-of-directors. Last visited February 18, 2020.

Mr. Renna served as Executive Vice President and Chief Financial Officer at Steward Health Care System, LLC where his management responsibilities include controller, corporate finance, reimbursement, supply chain and decision support.

Mr. Renna holds a BS from Princeton University and an MBA from Duke University.

**Defendant Schweitzer**

42.     Defendant Sheila H. Schweitzer ("Schweitzer") has served as a Company director since March 6, 2018. She also serves as the Chair of the Company's Compensation Committee, and as a member of the Nominating and Corporate Governance Committee and Audit Committee.

43.     The 2017 10-K states the following about Defendant Schweitzer:

Effective March 6, 2018 Ms. Schweitzer was appointed to the Board of Directors. Ms. Schweitzer brings to the Board over 30 years of business experience in the healthcare field, specifically the revenue cycle. In such capacity, she has held numerous founder and executive/industry association leadership roles with several companies and organizations.

From 2002 until 2009, she served as Chief Executive Officer of CareMedic Systems, Inc., a provider of revenue cycle management solutions to hospitals and healthcare providers in the United States and Puerto Rico. Thereafter, from 2009 until 2011, she served as Senior Vice President of Strategy for Optum, Inc., a provider of healthcare analytics, population health management, clinical performance, revenue cycle management, medical necessity, risk and quality enablement, and compliance solutions to provider organizations, and benefits management, health management, financial management, and health and well-being solutions to Fortune 500 employers. Additionally, and most recently, she founded and served as Chief Executive Officer of PatientMatters, LLC, a manager of patient receivables for hospitals and healthcare providers.

Furthermore, her industry association leadership positions included Chairman of AFEHCT (2005), member of the WEDI Foundation Board (2001 and 2002). She was awarded Person of the Year by HIMSS Medical Banking Project in 2008 and was also nominated as Entrepreneur of the Year in Louisville, Kentucky in 1993 and was a founder and author of a whitepaper for EDI-USA. Ms. Schweitzer holds a B.S. degree in Chemistry from Western Kentucky University.

44.     Upon information and belief, Defendant Schweitzer is a resident of Florida.

**Defendant Burnett**

45.     Defendant Mark Burnett ("Burnett") was a shareholder of the Company and a participant in the Pump and Dump Scheme. Defendant Burnett is a named Defendant in the DOJ Action and the SEC Action.

**Defendant Miller**

46.     Defendant Jeffrey Miller ("Miller") was a shareholder of the Company and a participant in the Pump and Dump Scheme. Defendant Miller is a named Defendant in the DOJ Action and the SEC Action.

**Defendant Sarro**

47.     Defendant Frank Sarro ("Sarro") was a shareholder of the Company and a participant in the Pump and Dump Scheme. Defendant Sarro is a named Defendant in the DOJ Action and the SEC Action.

48.     Upon information and belief, Defendant Sarro is a resident of Florida.

**Defendant Vassallo**

49.     Defendant Anthony Vassallo ("Vassallo") was a shareholder of the Company and a participant in the Pump and Dump Scheme. He owned and served as the CEO of Elite Stock Research at all relevant times. Defendant Vassallo is a named Defendant in the SEC Action.

**Defendant Elite Stock Research**

50.     Elite Stock Research is a privately-owned New York entity located at One Dupont Street, Suite 211, Plainview, New York 11803. Elite Stock Research participated in the Pump and Dump Scheme and is a named Defendant in the SEC Action.

51.     Elite Stock Research is incorporated in New York, and headquartered in Plainview, New York.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

52.     By reason of their positions as officers, directors, and fiduciaries of First Choice, and because of their ability to control the business and corporate affairs of First Choice, the Individual Defendants owed First Choice and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage First Choice in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of First Choice and its shareholders so as to benefit all shareholders equally.

53.     Each director and officer of the Company owes to First Choice and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

54.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of First Choice, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

55.     To discharge their duties, the officers and directors of First Choice were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

56.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of First Choice, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the

Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised First Choice's Board at all relevant times.

57.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the OTC, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

58.     To discharge their duties, the officers and directors of First Choice were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of First Choice were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Florida, and the United States, and pursuant to First Choice's own Code of Conduct and Ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how First Choice conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of First Choice and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that First Choice's operations would comply with all applicable laws and First Choice's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

59.     Each of the Individual Defendants further owed to First Choice and the shareholders the duty of loyalty requiring that each favor First Choice's interest and that of its

shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

60.     At all times relevant hereto, the Individual Defendants were the agents of each other and of First Choice and were at all times acting within the course and scope of such agency.

61.     Because of their advisory, executive, managerial, and directorial positions with First Choice, each of the Individual Defendants had access to adverse, non-public information about the Company.

62.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by First Choice.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

63.     In committing the wrongful acts alleged herein, the Individual Defendants and Shareholder Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein.  The Shareholder Defendants further aided and abetted and/or assisted the Individual Defendants in breaching their duties.

64.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' and Shareholder Defendants' violations of law, including breaches of fiduciary duty and the aiding and abetting thereof, unjust enrichment, and violations of the Exchange Act.

65.     The Individual Defendants and Shareholder Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by engaging in or allowing the Pump and Dump Scheme and by causing the Company purposefully, recklessly, or negligently to

conceal material facts, fail to correct such misrepresentations, and violate applicable laws.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants and Shareholder Defendants collectively and individually took the actions set forth herein.  Because the actions described herein occurred under the authority and approval of the Board, each of the Individual Defendants, who are directors of First Choice, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

66.     Each of the Shareholder Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants and Shareholder Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

67.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of First Choice, and was at all times acting within the course and scope of such agency.

### FIRST CHOICE'S CODE OF CONDUCT AND ETHICS

68.     First Choice's Code of Conduct and Ethics (the "Code of Conduct") states that it "sets out basic principles to guide the directors, officers, and employees of the Company. All Company directors, officers, and employees should conduct themselves accordingly and seek to avoid even the appearance of improper behavior in any way relating to the Company."

69.     In a section titled, "Scope of Code," the Code of Conduct states that it is intended "to deter wrongdoing," and to encourage the following:

- honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

- full, fair, accurate, timely, and understandable disclosure in reports and documents the Company files with, or submits to, the Securities and Exchange Commission (the "SEC") and in other communications made by the Company;

- compliance with applicable governmental laws, rules, and regulations;

- the prompt internal reporting of violations of this Code to the appropriate person or persons identified in this Code;

- accountability for adherence to this Code; and

- adherence to a high standard of business ethics.

70.     In a section titled, "Compliance with Law, Rules, and Regulations," the Code of Conduct provides the following:

Obeying the law, both in letter and in spirit, is the foundation on which the Company's ethical standards are built. All directors, officers, and employees should respect and obey all laws, rules, and regulations applicable to the business and operations of the Company. Although directors, officers, and employees are not expected to know all of the details of these laws, rules, and regulations, it is important to know enough to determine when to seek advice from supervisors, managers, officers, or other appropriate Company personnel.

71.     In a section titled, "Conflicts of Interest," the Code of Conduct provides the following, in relevant part:

A "conflict of interest" exists when an individual's private interest interferes in any way or even appears to conflict - with the interests of the Company. A conflict of interest situation can arise when a director, officer, or employee takes actions or has interests that may make it difficult to perform his or her work on behalf of the Company in an objective and effective manner. Conflicts of interest may also arise when a director, officer, or employee, or a member of his or her family, receives improper personal benefits as a result of his or her position with the Company. Loans to, or guarantees of obligations of, employees and their immediate family members may create conflicts of interest.

Service to the Company should never be subordinated to personal gain or advantage. Conflicts of interest, whenever possible, should be avoided.

72.     In a section titled, "Insider Trading," the Code of Conduct provides the following:

Directors, officers, and employees who have access to confidential information relating to the Company are not permitted to use or share that information for stock trading purposes or for any other purpose except the conduct of the Company's business. All nonpublic information about the Company should be considered confidential information. To use non-public information for personal financial benefit or to "tip" others who might make an investment decision on the basis of this information is not only unethical and against Company policy but is also illegal. Directors, officers, and employees also should comply with insider trading standards and procedures adopted by the Company. If a question arises, the director, officer, or employee should consult with the Company's Chief Financial Officer.

73.     In a section titled, "Competition and Fair Dealing," the Code of Conduct provides

the following, in relevant part:

The Company seeks to compete in a fair and honest manner. The Company seeks competitive advantages through superior performance rather than through unethical or illegal business practices. Stealing proprietary information, possessing trade secret information that was obtained without the owner's consent, or inducing such disclosures by past or present employees of other companies is prohibited. Each director, officer, and employee should endeavor to respect the rights of and deal fairly with the Company's customers, suppliers, service providers, competitors, and employees. No director, officer, or employee should take unfair advantage of anyone relating to the Company's business or operations through manipulation, concealment, or abuse of privileged information, misrepresentation of material facts, or any unfair dealing practice.

74.     In a section titled, "Record-Keeping," the Code of Conduct provides the following:

The Company requires honest and accurate recording and reporting of information in order to make responsible business decisions.

Many officers and employees regularly use business expense accounts, which must be documented and recorded accurately. If an officer or employee is not sure whether a certain expense is legitimate, the employee should ask his or her supervisor or the Company's controller. Rules and guidelines are available from the Accounting Department.

All of the Company's books, records, accounts, and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions, and must conform both to applicable legal requirements and to the Company's system of internal controls. Unrecorded or "off the books" funds or assets should not be maintained unless permitted by applicable law or regulation.

Business records and communications often become public, and the Company and its officers and employees in their capacity with the Company should avoid exaggeration, derogatory remarks, guesswork, or inappropriate characterizations of people and companies that can be misunderstood. This applies equally to e-mail, internal memos, and formal reports. The Company's records should always be retained or destroyed according to the Company's record retention policies. In accordance with those policies, in the event of litigation or governmental investigation, directors, officers, and employees should consult with the Company's Chief Financial Officer or legal counsel before taking any action because it is critical that any impropriety or possible appearance of impropriety be avoided.

75. In a section titled, "Protection and Proper Use of Company Assets," the Code of

Conduct provides the following:

All directors, officers, and employees should endeavor to protect the Company's assets and ensure their efficient use. Theft, carelessness, and waste have a direct impact on the Company's profitability. Any suspected incident of fraud or theft should be immediately reported for investigation. Company assets should be used for legitimate business purposes and should not be used for non-Company business.

The obligation to protect the Company's assets includes its proprietary information. Proprietary information includes intellectual property, such as trade secrets, patents, trademarks, and copyrights, as well as business, marketing, and service plans, engineering and manufacturing ideas, designs, databases, records, salary information, and any unpublished financial data and reports. Unauthorized use or distribution of this information would violate Company policy. It could also be illegal and result in civil or even criminal penalties.

76. In a section titled "Corporate Disclosures," the Code of Conduct provides the

following:

All directors, officers, and employees should support the Company's goal to have full, fair, accurate, timely, and understandable disclosure in the periodic reports required to be filed by the Company with the SEC. Although most employees hold positions that are far removed from the Company's required filings with the SEC, each director, officer, and employee should promptly bring to the attention of the Chief Executive Officer, the Chief Financial Officer, the Company's Disclosure Committee, or the Audit Committee, as appropriate in the circumstances, any of the following:

- Any material information to which such individual may become aware that affects the disclosures made by the Company in its public filings or would otherwise assist the Chief Executive Officer, the Chief Financial Officer, the Disclosure Committee, and the Audit Committee in fulfilling their responsibilities with respect to such public filings.

- Any information the individual may have concerning (a) significant deficiencies in the design or operation of internal controls that could adversely affect the Company's ability to record, process, summarize, and report financial data or (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures, or internal controls.

- Any information the individual may have concerning any violation of this Code, including any actual or apparent conflicts of interest between personal and professional relationships, involving any management or other employees who have a significant role in the Company's financial reporting, disclosures, or internal controls.

- Any information the individual may have concerning evidence of a material violation of the securities or other laws, rules, or regulations applicable to the Company and the operation of its business, by the Company or any agent thereof, or of violation of this Code.

77.     In a section titled, "Reporting any Illegal or Unethical Behavior," the Code of Conduct provides the following, in relevant part:

> Directors and officers are encouraged to talk to the Chief Executive Officer, the Chief Financial Officer, or legal counsel, and employees are encouraged to talk to supervisors, managers, or other appropriate personnel, when in doubt about the best course of action in a particular situation. Directors, officers, and employees should promptly report any observed illegal or unethical behavior and any perceived violations of laws, rules, regulations, or this Code to the Chief Financial Officer. It is the policy of the Company not to allow retaliation for reports of misconduct by others made in good faith. Directors, officers, and employees are expected to cooperate in internal investigations of misconduct.

78.     The Company also maintains a "Disclosure Policy" which provides that the Company is "committed to providing timely, orderly, consistent and credible information, consistent with legal and regulatory requirements, to enable orderly trading in our publicly held securities."

79.     The Company's Disclosure Policy states that "[a]ny information that could be expected to affect the Company's stock price, whether it is positive or negative, should be considered material."

80.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's internal controls over public reporting, of the Pump and Dump Scheme, and of the Individual Defendants' scheme to issue materially false and misleading statements to the public and facilitate and disguise the Individual Defendants' and Shareholder Defendants' violations of law, including breaches of fiduciary duty and the aiding and abetting thereof, unjust enrichment, and violations of the Exchange Act. Moreover, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

81.     First Choice, which previously operated under the name Medical Billing Assistance, Inc., is a healthcare services company based in Melbourne, Florida. The Company manages a network of healthcare platforms providing treatment in orthopedics, spine surgery, and other related areas of medicine.

82.     During the Relevant Period, First Choice stock qualified as a microcap, or "penny" stock, meaning the Company's shares typically traded for less than $5.00 per share.

### The Pump and Dump Scheme

83.     Starting at least in September 2013, Defendants Romandetti, Burnett, Miller, Sarro, and Vassallo concocted and put into action the Pump and Dump Scheme, an elaborate plan to manipulate the value of First Choice shares and defraud unsuspecting investors.

84.     The Pump and Dump Scheme was effectuated through Elite Stock Research, a call center and stock promotion business run by Defendant Vassallo. Elite Stock Research operated

out of an office in White Plains, New York, and was used to promote a number of microcap securities, typically by way of aggressive, "strong-arm" promotional campaigns.

85.     In connection with the Pump and Dump Scheme, Defendant Romandetti helped the other Shareholder Defendants acquire sizable blocks of Company shares pursuant to debt conversion or share exchange agreements, generally at below-market price. The shares were deposited into a number of brokerage accounts controlled by certain of the Shareholder Defendants, and then allocated amongst the Shareholder Defendants. These accounts were typically in the names of individuals and entities other than the Shareholder Defendants, thereby fraudulently concealing Defendant Romandetti's and the other Shareholder Defendants' control over the First Choice shares held in the accounts.

86.     Subsequently, the Shareholder Defendants, along with sales personnel at Elite Stock Research, specifically sought out and cold-called unsophisticated and often elderly investors for the purpose of coercing them into purchasing First Choice stock. While this was taking place, the Shareholder Defendants engaged in a variety of manipulative trading techniques calculated to make the Company's stock appear to be a sounder investment than it actually was, which the Shareholder Defendants failed to disclose to the investors they solicited. These techniques included making "matched trades" and "wash trades," in which the Shareholder Defendants, coordinating with each other and acting through various brokerage accounts and other entities they controlled, would repeatedly sell their First Choice shares to each other, or to themselves, respectively. The Shareholder Defendants also engaged in a practice known as "marking the close," in which they would purchase large quantities of First Choice shares shortly before the close of trading on a given day, thereby inflating the closing price of Company stock. During this period, Defendant Romandetti visited Elite Stock Research on a number of occasions to discuss the Pump and Dump

Scheme and to provide Elite Stock Research sales personnel with exaggerated information about the Company to be used to induce prospective investors into buying shares.

87.     The trading techniques implemented by the Shareholder Defendants had the effect of artificially inflating the trading volume and ultimately the price of First Choice shares. Between September 2013 and March 2014, while the Pump and Dump Scheme was being carried out, the price of the Company's stock swelled from $0.90 to $3.40 per share. The share price remained close to or above $1.00 through to November 2018.

88.     Ultimately, the Shareholder Defendants reaped substantial profits by selling their shares at the artificially inflated prices generated by the Pump and Dump Scheme. Between September 2013 and June 2016, Defendants Burnett, Miller, Sarro, and Vassallo executed roughly 4,300 trades of Company stock and received over $3.3 million in fraudulent profits, with Defendant Burnett receiving approximately $193,000 in fraudulent profits, Defendant Miller receiving approximately $340,000 in fraudulent profits, Defendant Sarro receiving approximately $2.3 million in fraudulent profits, Defendant Vassallo receiving approximately $485,000 in fraudulent profits, and Defendant Romandetti receiving over $560,000 in kickbacks from the other Shareholder Defendants. The Shareholder Defendants also collectively paid Elite Stock Research and Defendant Vassallo almost $1 million in cash and Company stock, as payment for the services Elite Stock Research rendered in furtherance of the Pump and Dump Scheme.  All the while, the over 100 investors who were coerced by the Shareholder Defendants into purchasing Company stock at artificially high prices suffered losses of at least $2.5 million, collectively.

89.     The Shareholder Defendants laundered their ill-gotten gains by transferring the proceeds of the scheme to various bank accounts in the names of companies controlled by certain of the Shareholder Defendants and other individuals. The funds were then transferred to bank

accounts directly owned by each of the Shareholder Defendants. Thereafter, the Shareholder Defendants withdrew funds from these accounts in cash increments of less than $10,000 each, so as to evade reporting requirements.

90.     Throughout the Relevant Period, Defendant Romandetti, in collaboration with the other Shareholder Defendants, continued to engage in the Pump and Dump Scheme. Despite their awareness of and/or participation in this fraudulent scheme, the Individual Defendants excluded any mention of the Pump and Dump Scheme and its ramifications from the Company's SEC filings issued during the Relevant Period.

## **Materially False and Misleading Statements**

### *March 31, 2014 Form 10-K*

91.     On March 31, 2014, the Company filed its annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2013 (the "2013 10-K"). The 2013 10-K was signed by Defendants Romandetti and Bittar, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Romandetti and Bittar attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

92.     In its discussion of the risk factors facing the Company, the 2013 10-K stated that "[t]he market price of our common stock could also be subject to wide fluctuations in response to many risk factors described in this section and other matters . . ." The 2013 10-K gave the following examples of factors affecting the Company's stock price:

- changes by securities analysts in financial estimates of our operating results and the operating results of our competitors;
- publications of research reports by securities analysts about us, our competitors or our industry;

- fluctuations in the valuation of companies perceived by investors to be comparable to us;
- actual or anticipated fluctuations in our quarterly or annual operating results;
- retention and departures of key personnel;
- our failure or the failure of our competitors to meet analysts' projections or guidance that we or our competitors may give to the market;
- strategic decisions by us or our competitors, such as acquisitions, divestitures, spin-offs, joint ventures, strategic investments or changes in business strategy;
- the passage of legislation or other regulatory developments affecting us or our industry;
- speculation in the press or investment community; and
- natural disasters, terrorist acts, acts of war or periods of widespread civil unrest.

93. The 2013 10-K stated the following with respect to the Company's compliance with

laws, rules, and regulations:

We maintain a compliance program that reflects our commitment to complying with all laws, rules and regulations applicable to our business and that meets our ethical obligations in conducting our business (the "Compliance Program"). We believe our Compliance Program provides a solid framework to meet this commitment and our obligations as a provider of healthcare services, including:

- a Compliance Committee consisting of our senior executives;
- our *Code of Ethics*, which is applicable to our employees, officers and directors;
- a disclosure program that includes a mechanism to enable individuals to disclose on a confidential or anonymous basis to our Chief Executive Officer, or any person who is not in the disclosing individual's chain of command, issues or questions believed by the individual to be a potential violation of criminal, civil, or administrative laws;
- an organizational structure designed to integrate our compliance objectives into our corporate offices and Medical Centers of Excellence; and
- education, monitoring and corrective action programs, including a disclosure policy designed to establish methods to promote the understanding of our Compliance Program and adherence to its requirements.

The foundation of our Compliance Program is our *Code of Ethics* which is intended to be a comprehensive statement of the ethical and legal standards governing the daily activities of our employees, affiliated professionals, independent contractors, officers and directors. All our personnel are required to abide by, and are given thorough education regarding, our *Code of Ethics*. In addition, all employees are

expected to report incidents that they believe in good faith may be in violation of our *Code of Ethics*.

***April 15, 2015 Form 10-K***

94.     On April 15, 2015, the Company filed its annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2014 (the "2014 10-K"). The 2014 10-K was signed by Defendants Romandetti and Bittar, and contained SOX certifications signed by Defendants Romandetti and Bittar attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

95.     In its discussion of the risk factors facing the Company, the 2014 10-K stated the following:

> The stock market in general has experienced extreme price and volume fluctuations. The market prices of the securities of healthcare services companies have been highly historically volatile and may be highly volatile in the future. This volatility has often been unrelated to the operating performance of particular companies. The following factors, in addition to other risk factors described in this section, may have a significant impact on the market price of our common stock:
>
> - changes in government regulation of the medical industry;
> - changes in reimbursement policies of third-party insurance companies, self-insured companies or government agencies;
> - actual or anticipated fluctuations in our operating results;
> - changes in financial estimates or recommendations by securities analysts;
> - developments involving corporate collaborators, if any;
> - changes in accounting principles; and
> - the loss of any of our key physicians or management personnel.

96.     The 2014 10-K stated the following with respect to the Company's compliance with laws, rules, and regulations:

> We maintain a compliance program that reflects our commitment to complying with all laws, rules and regulations applicable to our business and that meets our ethical obligations in conducting our business (the "Compliance Program"). We believe our Compliance Program provides a solid framework to meet this commitment and our obligations as a provider of healthcare services, including:

- a Compliance Committee consisting of our senior executives;
- our *Code of Ethics*, which is applicable to our employees, officers and directors;
- a disclosure program that includes a mechanism to enable individuals to disclose on a confidential or anonymous basis to our Chief Executive Officer, or any person who is not in the disclosing individual's chain of command, issues or questions believed by the individual to be a potential violation of criminal, civil, or administrative laws;
- an organizational structure designed to integrate our compliance objectives into our corporate offices and Medical Centers of Excellence; and
- education, monitoring and corrective action programs, including a disclosure policy designed to establish methods to promote the understanding of our Compliance Program and adherence to its requirements.

The foundation of our Compliance Program is our *Code of Ethics* which is intended to be a comprehensive statement of the ethical and legal standards governing the daily activities of our employees, affiliated professionals, independent contractors, officers and directors. All our personnel are required to abide by, and are given thorough education regarding, our *Code of Ethics*. In addition, all employees are expected to report incidents that they believe in good faith may be in violation of our *Code of Ethics*.

### *April 14, 2016 Form 10-K*

97.     On April 14, 2016, the Company filed its annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2015 (the "2015 10-K"). The 2015 10-K was signed by Defendants Romandetti and Bittar, and contained SOX certifications signed by Defendants Romandetti and Bittar attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

98.     In its discussion of the risk factors facing the Company, the 2015 10-K stated the following:

The stock market in general has experienced extreme price and volume fluctuations. The market prices of the securities of healthcare services companies have been highly historically volatile and may be highly volatile in the future. This volatility has often been unrelated to the operating performance of particular

companies. The following factors, in addition to other risk factors described in this section, may have a significant impact on the market price of our Common Stock:

- changes in government regulation of the medical industry;
- changes in reimbursement policies of third-party insurance companies, self-insured companies or government agencies;
- actual or anticipated fluctuations in our operating results;
- changes in financial estimates or recommendations by securities analysts;
- developments involving corporate collaborators, if any;
- changes in accounting principles; and
- the loss of any of our key physicians or management personnel.

99.     The 2015 10-K also stated the following with respect to the effect of the Company's operations on fluctuations in the Company's stock price:

Our quarterly operating results are likely to fluctuate in the future. These fluctuations could cause our stock price to decline. The nature of our business involves variable factors, such as the timing of the research, development and regulatory pathways of our product candidates, which could cause our operating results to fluctuate. Due to the possibility of fluctuations in our revenues and expenses, we believe that quarter-to-quarter comparisons of our operating results are not a good indication of our future performance.

100.     The 2015 10-K stated the following with respect to the Company's compliance with laws, rules, and regulations:

We maintain a compliance program that reflects our commitment to complying with all laws, rules and regulations applicable to our business and that meets our ethical obligations in conducting our business (the "Compliance Program"). We believe our Compliance Program provides a solid framework to meet this commitment and our obligations as a provider of healthcare services, including:

- a Compliance Committee consisting of our senior executives;
- our *Code of Ethics*, which is applicable to our employees, officers and directors;
- a disclosure program that includes a mechanism to enable individuals to disclose on a confidential or anonymous basis to our Chief Executive Officer, or any person who is not in the disclosing individual's chain of command, issues or questions believed by the individual to be a potential violation of criminal, civil, or administrative laws;
- an organizational structure designed to integrate our compliance objectives into our corporate offices and Medical Centers of Excellence; and
- education, monitoring and corrective action programs, including a disclosure policy designed to establish methods to promote the

> understanding of our Compliance Program and adherence to its requirements.

> The foundation of our Compliance Program is our *Code of Ethics* which is intended to be a comprehensive statement of the ethical and legal standards governing the daily activities of our employees, affiliated professionals, independent contractors, officers and directors. All our personnel are required to abide by, and are given thorough education regarding, our *Code of Ethics*. In addition, all employees are expected to report incidents that they believe in good faith may be in violation of our *Code of Ethics*.

### April 3, 2017 Form 10-K

101.    On April 3, 2017, the Company filed its annual report on Form 10-K/A with the SEC for the fiscal year ended December 31, 2016 (the "2016 10-K"). The 2016 10-K was signed by Defendant Romandetti and non-party Timothy K. Skeldon ("Skeldon"), and contained SOX certifications signed by Defendant Romandetti and non-party Skeldon attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

102.    In its discussion of the risk factors facing the Company, the 2016 10-K stated the following:

> The stock market in general has experienced extreme price and volume fluctuations. The market prices of the securities of healthcare services companies have been highly historically volatile and may be highly volatile in the future. This volatility has often been unrelated to the operating performance of particular companies. The following factors, in addition to other risk factors described in this section, may have a significant impact on the market price of our Common Stock:

> - changes in government regulation of the medical industry;
> - changes in reimbursement policies of third-party insurance companies, self-insured companies or government agencies;
> - actual or anticipated fluctuations in our operating results;
> - changes in financial estimates or recommendations by securities analysts;
> - developments involving corporate collaborators, if any;
> - changes in accounting principles; and
> - the loss of any of our key physicians or management personnel.

103.    The 2016 10-K also stated the following with respect to the effect of the Company's

operations on fluctuations in the Company's stock price:

> Our quarterly operating results are likely to fluctuate in the future. These
> fluctuations could cause our stock price to decline. The nature of our business
> involves variable factors, such as the timing of the research, development and
> regulatory pathways of our product candidates, which could cause our operating
> results to fluctuate. Due to the possibility of fluctuations in our revenues and
> expenses, we believe that quarter-to-quarter comparisons of our operating results
> are not a good indication of our future performance.

104.    The 2016 10-K stated the following with respect to the Company's compliance with

laws, rules, and regulations:

> We maintain a compliance program that reflects our commitment to complying
> with all laws, rules and regulations applicable to our business and that meets our
> ethical obligations in conducting our business (the "Compliance Program"). We
> believe our Compliance Program provides a solid framework to meet this
> commitment and our obligations as a provider of healthcare services, including:
>
> - a Compliance Committee consisting of our senior executives;
> - our *Code of Ethics*, which is applicable to our employees, officers and
>   directors;
> - a disclosure program that includes a mechanism to enable individuals to
>   disclose on a confidential or anonymous basis to our Chief Executive
>   Officer, or any person who is not in the disclosing individual's chain of
>   command, issues or questions believed by the individual to be a potential
>   violation of criminal, civil, or administrative laws;
> - an organizational structure designed to integrate our compliance objectives
>   into our corporate offices and Medical Centers of Excellence; and
> - education, monitoring and corrective action programs, including a
>   disclosure policy designed to establish methods to promote the
>   understanding of our Compliance Program and adherence to its
>   requirements.
>
> The foundation of our Compliance Program is our *Code of Ethics* which is intended
> to be a comprehensive statement of the ethical and legal standards governing the
> daily activities of our employees, affiliated professionals, independent contractors,
> officers and directors. All our personnel are required to abide by, and are given
> thorough education regarding, our *Code of Ethics*. In addition, all employees are
> expected to report incidents that they believe in good faith may be in violation of
> our *Code of Ethics*.

*April 2, 2018 Form 10-K*

105.     On April 2, 2018, the Company filed the 2017 10-K. The 2017 10-K was signed by Defendants Romandetti, Keller, and Schweitzer, and contained SOX certifications signed by Defendants Romandetti and Keller attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

106.     In its discussion of the risk factors facing the Company, the 2017 10-K stated the following:

> The stock market in general has experienced extreme price and volume fluctuations. The market prices of the securities of healthcare services companies have been highly historically volatile and may be highly volatile in the future. This volatility has often been unrelated to the operating performance of particular companies. The following factors, in addition to other risk factors described in this section, may have a significant impact on the market price of our Common Stock:
>
> - changes in government regulation of the medical industry;
> - changes in reimbursement policies of third-party insurance companies, self-insured companies or government agencies;
> - actual or anticipated fluctuations in our operating results;
> - changes in financial estimates or recommendations by securities analysts;
> - developments involving corporate collaborators, if any;
> - changes in accounting principles; and
> - the loss of any of our key physicians or management personnel.

107.     The 2017 10-K also stated the following with respect to the effect of the Company's operations on fluctuations in the Company's stock price:

> Our quarterly operating results are likely to fluctuate in the future. These fluctuations could cause our stock price to decline. The nature of our business involves variable factors, such as the timing of the research, development and regulatory pathways of our product candidates, which could cause our operating results to fluctuate. Due to the possibility of fluctuations in our revenues and expenses, we believe that quarter-to-quarter comparisons of our operating results are not a good indication of our future performance.

108.    The 2017 10-K stated the following with respect to the Company's compliance with laws, rules, and regulations:

> We maintain a compliance program that reflects our commitment to complying with all laws, rules and regulations applicable to our business and that meets our ethical obligations in conducting our business (the "Compliance Program"). We believe our Compliance Program provides a solid framework to meet this commitment and our obligations as a provider of healthcare services, including:
>
> - a Compliance Committee consisting of our senior executives;
> - our *Code of Ethics*, which is applicable to our employees, officers and directors;
> - a disclosure program that includes a mechanism to enable individuals to disclose on a confidential or anonymous basis to our Chief Executive Officer, or any person who is not in the disclosing individual's chain of command, issues or questions believed by the individual to be a potential violation of criminal, civil, or administrative laws;
> - an organizational structure designed to integrate our compliance objectives into our corporate offices and Medical Centers of Excellence; and
> - education, monitoring and corrective action programs, including a disclosure policy designed to establish methods to promote the understanding of our Compliance Program and adherence to its requirements.
>
> The foundation of our Compliance Program is our *Code of Ethics* which is intended to be a comprehensive statement of the ethical and legal standards governing the daily activities of our employees, affiliated professionals, independent contractors, officers and directors. All our personnel are required to abide by, and are given thorough education regarding, our *Code of Ethics*. In addition, all employees are expected to report incidents that they believe in good faith may be in violation of our *Code of Ethics*.

109.    The statements referenced in ¶¶ 91-108 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose that: (1) Defendant Romandetti and a number of other individuals and entities were engaged in the Pump and Dump Scheme; (2) as a result of the Pump and Dump Scheme, First Choice and certain of its management would be subject to heightened scrutiny from government agencies, including the DOJ and the SEC, which would foreseeably culminate in significant damage to the Company, including legal

liability and loss of reputation; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

110.    On November 15, 2018, the DOJ issued a press release announcing that a criminal indictment against Defendants Romandetti, Burnett, Miller, and Sarro had been unsealed in the United States District Court for the Eastern District of New York on November 14, 2018. The press release stated the following, in relevant part:

> An indictment was unsealed today in federal court in Central Islip charging Christian Romandetti, Sr., the Chief Executive Officer of First Choice Healthcare Solutions, Inc (FCHS), a publicly traded company based in Melbourne, Florida, and his associates Frank Sarro, Jeffrey Miller and Mark Burnett, with conducting a pump and dump scheme in coordination with Elite Stock Research (ESR), a boiler room, to defraud investors in FCHS that operated in Plainview, New York.  The charges include conspiracies to commit securities fraud, wire fraud and money laundering, and substantive securities fraud.

> * * *

> As alleged in the indictment, between May 2013 and June 2016, the Defendants, together with others, engaged in a multi-million dollar scheme to defraud investors in FCHS, many of whom were elderly, by artificially controlling the price and volume of traded shares in the FCHS by artificially generating price movements and trading volume in the shares, and by including material misrepresentations and omissions in their communications with victim investors about FCHS stock. The Defendants promoted the stocks primarily through cold-call campaigns and circulation of a newsletter. The Defendants fraudulently concealed their control of FCHS shares by holding them in brokerage accounts in the names of other individuals or entities.  The Defendants then laundered over $3 million in proceeds of the foregoing stock manipulation scheme.

111.    Also on November 15, 2018, the SEC issued a press release announcing the commencement of the SEC Action, which named each of the Shareholder Defendants as defendants. The press release noted that the SEC Action had been filed in connection with a "continuing investigation" by the SEC, and stated the following, in relevant part:

The Securities and Exchange Commission today brought additional charges against a Long Island, New York-based boiler room previously sued for defrauding elderly and unsophisticated investors. The latest charges allege that First Choice Healthcare Solutions Inc. CEO Christian Romandetti, the boiler room, and four others, manipulated the company's shares generating more than $3.3 million of illegal profits and more than $560,000 in kickbacks for Romandetti.

The SEC's complaint alleges that Romandetti and the other Defendants duped more than 100 victims in a scheme that inflated First Choice's stock price from less than $1 per share to $3.40 per share. According to the complaint, from at least September 2013 until about June 2016, the Defendants used multiple accounts in an attempt to disguise their trading, engaged in manipulative trading practices, and hired Elite Stock Research, a boiler room run by Defendant Anthony Vassallo, to promote First Choice to vulnerable investors, some of who invested retirement savings.

\* \* \*

In a related action in July 2017, the SEC originally charged boiler room Elite Stock Research, as well as another Long Island boiler room and 13 individuals, with bilking victims out of more than $10 million through high-pressure sales tactics and lies about penny stocks. Seven of those individuals have pleaded guilty to parallel criminal charges brought by the U.S. Attorney's Office for the Eastern District of New York. The SEC's litigation against the 13 individuals is continuing.

Today's SEC action, filed in federal district court in Central Islip, New York, charges Romandetti, Vassallo, Mark Burnett, Jeffrey Miller, Frank Sarro and Elite Stock Research with fraud and Burnett, Miller, Sarro, and Vassallo with market manipulation. The SEC is seeking permanent injunctions, return of allegedly ill-gotten gains with interest, civil penalties, penny stock bars, and officer-and-director bars against Romandetti and Burnett.

112.    On this news, the price of the Company's stock dropped from $1.01 per share at the close of trading on November 14, 2018, to $0.35 per share at the close of trading on November 15, 2018, representing a loss in value of almost 65%.

113.    On November 16, 2018, the Company issued a press release revealing that on November 15, 2018, the Board had placed Defendant Romandetti on "indefinite administrative leave." Defendant Romandetti resigned from the Board shortly afterward, on December 4, 2018.

114.    On January 2, 2019, the Company issued a press release announcing that on December 28, 2018, Defendant Romandetti had been terminated as President and CEO of the

Company, for "material, gross and willful misconduct in connection with his employment duties ... demonstrated by his actions that provided a basis for a grand jury indictment against him and a Securities and Exchange Commission lawsuit against him."

115.   On March 29, 2019, the Company filed with the SEC a notification of late filing on Form 12b-25 (the "March 2019 Form 12b-25"). The March 2019 Form 12b-25 disclosed that the Company would be unable to timely file its 2018 10-K, stating that the Company "is awaiting its audited financial statements from its independent auditor." The March 2019 Form 12b-25 further indicated that the Company expected that it would file the 2018 10-K "within the fifteen calendar day period" allotted to rectify late filings under SEC rules.

116.   On April 18, 2019, non-party Thomas Gill resigned from the Company's Board.

117.   On May 15, 2019, the Company filed with the SEC a second notification of late filing on Form 12b-25 (the "May 2019 Form 12b-25"). The May 2019 Form 12b-25 revealed that the Company would be unable to timely file its 1Q19 10-Q, and echoed the justification provided in the March 2019 Form 12b-25, stating that the Company "is awaiting its audited financial statements from its independent auditor." The May 2019 Form 12b-25 indicated that the Company expected to file the 1Q19 10-Q "as soon as practicable."

118.   As of February 19, 2020, Company stock traded at $0.19 per share.

119.   As of the date of the filing of this complaint, the Company has yet to file with the SEC the 2018 10-K, 1Q19 10-Q, or any subsequent periodic reports.

120.   The Company has failed to file any Form 12b-25s after it filed the May 2019 Form 12b-25 with the SEC.

**Repurchases**

121.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock at artificially inflated prices that substantially damaged the Company.

122.    According to the 2017 10-K, during the fiscal year ended December 31, 2017, the Company purchased 189,020 shares of its common stock for approximately $249,265, at an average price of $1.32 per share.

123.    As the Company's stock was actually worth only $0.35 per share, the price at closing on November 15, 2018, the amount the Company overpaid for repurchases of its own stock during the fiscal year ended December 31, 2017 was approximately $183,349.

## DAMAGES TO FIRST CHOICE

124.    As a direct and proximate result of the Individual Defendants' conduct, First Choice is losing and expending many millions of dollars.

125.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and its former CEO and the DOJ Action and SEC Action filed against, among others, the Company's former CEO, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

126.    Additionally, these expenditures include, but are not limited to, compensation, bonuses, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

127.    Such losses include the Company's overpayment by approximately $183,349 for repurchases of its own stock during the Relevant Period, during which the Company's stock price was artificially inflated due to the false and misleading statements discussed herein.

128.    As a direct and proximate result of the Individual Defendants' conduct, First Choice has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

129.    Plaintiff brings this action derivatively and for the benefit of First Choice to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of First Choice, unjust enrichment, violations of Sections 10(b) and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

130.    First Choice is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

131.    Plaintiff is, and has been at all relevant times, a shareholder of First Choice. Plaintiff will adequately and fairly represent the interests of First Choice in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

132.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

133.    A pre-suit demand on the Board of First Choice is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following three individuals: Defendants Augusta, Renna, and Schweitzer (the "Directors"). Plaintiff needs only to allege demand futility as to two of the three directors that were on the Board at the time this action was commenced.

134.     Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to facilitate the Pump and Dump Scheme, and to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

135.     In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly facilitated the Pump and Dump Scheme and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent schemes were, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

136.     Additional reasons that demand on Defendant Augusta is futile follow. Defendant Augusta has served as a Company director since September 7, 2018. He also serves as the Chair of the Company's Nominating and Corporate Governance Committee, and as a member of the Audit Committee and Compensation Committee. As a trusted Company director, he conducted little, if any, oversight of the Pump and Dump Scheme and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Augusta breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

137.    Additional reasons that demand on Defendant Renna is futile follow. Defendant Renna has served as a Company director since September 7, 2018. He also serves as the Chair of the Company's Audit Committee, and as a member of the Nominating and Corporate Governance Committee and Compensation Committee. As a trusted Company director, he conducted little, if any, oversight of the Pump and Dump Scheme and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Renna breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

138.    Additional reasons that demand on Defendant Schweitzer is futile follow. Defendant Schweitzer has served as a Company director since March 6, 2018. She also serves as the Chair of the Company's Compensation Committee, and as a member of the Nominating and Corporate Governance Committee and Audit Committee. As a trusted Company director, she conducted little, if any, oversight of the Pump and Dump Scheme and the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Schweitzer signed, and thus personally made the false and misleading statements in the 2017 10-K. For these reasons, too, Defendant Schweitzer breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

139.    Additional reasons that demand on the Board is futile follow.

140.    All three of the Directors served as members of the Audit Committee during the Relevant Period. The Directors failed to perform their duties as members of the Audit Committee, allowing the Company to issue false and misleading statements with the SEC and failing to cause the Company to correct them, and to operate with inadequate internal controls. Thus, the Directors breached their fiduciary duties, are not disinterested, and demand is excused as to them.

141.    Certainly, the Directors face a substantial likelihood of liability for causing the Company to fail to file with the SEC its Form 10-Qs, starting with the 1Q19 10-Q, and the 2018 10-K. Their reckless abdication of their duties is further evidenced by the fact that they caused the Company to fail to file any Form 12b-25s after it filed the May 2019 Form 12b-25 with the SEC.

142.    In violation of the Code of Conduct, the Directors conducted little, if any, oversight of the Company's internal controls over public reporting, of the Pump and Dump Scheme, and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' and Shareholder Defendants' violations of law, including breaches of fiduciary duty and the aiding and abetting thereof, unjust enrichment, and violations of Sections 10(b) and 20(a) of the Exchange Act. In violation of the Code of Conduct, the Directors failed to comply with the law. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

143.    First Choice has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for First Choice any part of the damages First Choice suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

144.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

145.    The acts complained of herein constitute violations of fiduciary duties owed by First Choice's officers and directors, and these acts are incapable of ratification.

146.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of First Choice. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of First Choice, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

147.    If there is no directors' and officers' liability insurance, then the Directors will not cause First Choice to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

148.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, certainly at least two of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Defendants Romandetti, Keller, Bittar, and Schweitzer for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act

149.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

150.    Defendants Romandetti, Keller, Bittar, and Schweitzer ("10b-5 Defendants") participated in a scheme to defraud with the purpose and effect of defrauding First Choice. Not only is First Choice now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also a victim of the unlawful scheme perpetrated upon First Choice by the 10b-5 Defendants. With the price of its common stock trading at artificially inflated prices during the Relevant Period due to the 10b-5 Defendants' misconduct, the 10b-5 Defendants caused the Company to repurchase thousands of its own shares at artificially-inflated prices, damaging First Choice.

151.    During the Relevant Period, the 10b-5 Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current

reports filed with the SEC after causing or allowing the Shareholder Defendants to engage in the Pump and Dump Scheme.

152.   The 10b-5 Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about First Choice not misleading.

153.   The 10b-5 Defendants, as top executives and/or directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and/or officers of the Company, the 10b-5 Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by First Choice. The 10b-5 Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The 10b-5 Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

154.   In addition to each of the 10b-5 Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive and/or director of the Company, they made and/or signed the Company's Form 10-Ks filed with the SEC during the Relevant Period.

155.     By virtue of the foregoing, the 10b-5 Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

156.     Plaintiff on behalf of First Choice has no adequate remedy at law.

## SECOND CLAIM

**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

157.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

158.     The Individual Defendants, by virtue of their positions with First Choice and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of First Choice and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause First Choice and the 10b-5 Defendants to engage in the illegal conduct and practices complained of herein and violate § 10(b) of the Exchange Act.

159.     Plaintiff on behalf of First Choice has no adequate remedy at law.

## THIRD CLAIM

**Against the Individual Defendants for Breach of Fiduciary Duties**

160.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

161.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of First Choice's business and affairs.

162.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

163.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual

Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of First Choice.

164.     In breach of their fiduciary duties owed to First Choice, the Individual Defendants intentionally or recklessly wasted corporate assets on repurchases of the Company's own stock at artificially inflated prices, willfully or recklessly engaged in and/or facilitated the Pump and Dump Scheme, and made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (1) Defendant Romandetti and a number of other individuals and entities were engaged in the Pump and Dump Scheme; (2) as a result of the Pump and Dump Scheme, First Choice and certain of its management would be subject to heightened scrutiny from government agencies, including the DOJ and the SEC, which would foreseeably culminate in significant damage to the Company, including legal liability and loss of reputation; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

165.     The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

166.     In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls, and caused the Company to fail to timely file certain of its financial statements with the SEC.

167.     The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public

statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of First Choice's securities and disguising insider sales.

168.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of First Choice's securities and engaging in insider sales.

169.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

170.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, First Choice has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

171.    Plaintiff on behalf of First Choice has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants and Shareholder Defendants for Unjust Enrichment

172.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

173.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, First Choice.

174.   The Shareholder Defendants, through their aiding and abetting of the Individual Defendants' misconduct, were unjustly enriched at the expense of, and to the detriment of, First Choice.

175.   The Individual Defendants and Shareholder Defendants either benefitted financially from the Pump and Dump Scheme, or based on improper conduct received bonuses, stock options, or similar compensation from First Choice that was tied to the performance or artificially inflated valuation of First Choice, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

176.   Plaintiff, as a shareholder and a representative of First Choice, seeks restitution from the Individual Defendants and the Shareholder Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, and/or excessive compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties, and all profits obtained by the Shareholder Defendants due to their aiding and abetting thereof.

177.   Plaintiff on behalf of First Choice has no adequate remedy at law.

## FIFTH CLAIM

**Against the Shareholder Defendants for Aiding and Abetting Breach of Fiduciary Duty**

178.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

179.    The Shareholder Defendants aided and abetted the Individual Defendants who breached their fiduciary duties to First Choice.

180.    The Shareholder Defendants' misconduct resulted in continuous, connected, and ongoing harm to the Company.

181.    Specifically, the Shareholder Defendants were instrumental in carrying out the Pump and Dump Scheme.  The Shareholder Defendants aided and abetted the Individual Defendants in perpetrating the Pump and Dump Scheme to reap personal financial benefit.

182.    The Shareholder Defendants are jointly and severally liable to the same extent as any other Individual Defendant is liable for breaches of fiduciary duty as set forth herein or violations of any other laws.

183.    As a direct and proximate result of the Shareholder Defendants' aiding and abetting of First Choice's directors' and officers' breaches of duty alleged herein, First Choice has sustained and will continue to sustain substantial damages.

184.    Plaintiff on behalf of First Choice has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants and Shareholder Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of First Choice, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that each of the Individual Defendants breached or aided and

abetted the breach of their fiduciary duties to First Choice;

(c)     Declaring that the Shareholder Defendants aided and abetted the Individual Defendants' breach of their fiduciary duties to First Choice;

(d)     Determining and awarding to First Choice the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants and Shareholder Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(e)     Directing First Choice and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect First Choice and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2.  a provision to permit the shareholders of First Choice to nominate at least two candidates for election to the board; and

3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(f)     Awarding First Choice restitution from each of the Individual Defendants and the Shareholder Defendants;

(g)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(h)      Granting such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: March 4, 2020                    Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

*/s/ Laurence M. Rosen*
Laurence M. Rosen
Fla. Bar No.: 0182877
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Fax: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

**VERIFICATION**

I, Jelena Zurilo  am a plaintiff in the within action.   I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 19th day of  February , 2020.

_____
Jelena Zurilo